USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT _________________________ No. 95-1090 NATIONAL ASSOCIATION OF SOCIAL WORKERS, ET AL., Plaintiffs, Appellees, v. JOHN B. HARWOOD, ET AL., Defendants, Appellants. _________________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND [Hon. Raymond J. Pettine, Senior U.S. District Judge] __________________________ _________________________ Before Selya, Cyr and Lynch, Circuit Judges. ______________ _________________________ John A. MacFadyen for appellants. _________________ Jeffrey B. Pine, Attorney General, and Alan M. Shoer, _________________ _______________ Special Assistant Attorney General, on brief for State of Rhode Island, amicus curiae. Amy R. Tabor, with whom Hardy Wood Tabor & Chudacoff was on _____________ ____________________________ brief, for appellees. _________________________ November 13, 1995 _________________________ SELYA, Circuit Judge. Over a century ago, Charles SELYA, Circuit Judge. _____________ Dudley Warner, a nineteenth-century Connecticut journalist, earned a sliver of immortality by coining the phrase "politics makes strange bedfellows." This appeal, which forges an improbable alliance among such disparate groups as the National Association of Social Workers, the Rhode Island State Rifle and Revolver Association, the Rhode Island Affiliate of the American Civil Liberties Union, the Rhode Island State Right to Life Committee, Inc., the Coalition to Preserve Choice, the National Education Association, and Ocean State Action, proves that the aphorism still has force. Here, the improbable allies (all private, non-profit organizations) banded together with others to bring an action in Rhode Island's federal district court against John B. Harwood, Speaker of the Rhode Island House of Representatives (the House) and Guido Petteruti, the House's head doorkeeper.1 The plaintiffs challenged the constitutionality of House Rule 45 a rule that purports to ban both lobbyists and lobbying from the floor of the House while the House is in session on its face and as applied. The district court found for most of the plaintiffs and ordered the House to desist from continuing its prevailing practices with regard to the interpretation and  ____________________ 1Other plaintiffs in the underlying action included several individuals registered as lobbyists for non-profit organizations (Kate Coyne-McCoy, Harvey Press, Scott Nova, Barbara Baldwin, Susan Closter-Godoy, Steven Brown, Barbara Colt, Donn Dibiasio, Anna Sullivan, and Marti Rosenberg), and three elected members of the House (Edith Ajello, Barbara Burlingame, and Francis Gaschen). 2 enforcement of Rule 45. See National Ass'n of Social Workers v. ___ ________________________________ Harwood, 874 F. Supp. 530 (D.R.I. 1995) (Social Workers).2 _______ _______________ Given the benefit of briefing and argument on the doctrine of legislative immunity a benefit denied to the distinguished district judge, since the defendants inexplicably neglected to raise the issue in the lower court we reverse. I. BACKGROUND I. BACKGROUND We recount the facts "in the light most hospitable to the verdict-winner, consistent with record support." Cumpiano v. ________ Banco Santander P.R., 902 F.2d 148, 151 (1st Cir. 1990). ____________________ In January 1993, the House, under fresh leadership that had pledged procedural reform, adopted several new rules. Among them was Rule 45 (the full text of which is reproduced in the appendix). On its face, Rule 45 banishes all lobbyists from the floor of the House (and the House lounge) while the House is in session. Nonetheless, the rule permits members of the public to be on the House floor while the House is in session, provided that "they remain seated along the sides of the chamber, refrain from conversation, and maintain the decorum of the House," and provided further that they do not "directly or indirectly engage in the practice of lobbying." Rule 45(b).  ____________________ 2The district court nonetheless rebuffed the legislator- plaintiffs, who claimed that Rule 45 violated their First Amendment right to receive political information. The court ruled that, even if the legislators had been denied some level of access to lobbyists, the denial did not "rise[] to the level of a constitutional deprivation." Social Workers, 874 F. Supp. at ______________ 542. The legislator-plaintiffs have not appealed and, accordingly, we confine our discussion to the claims brought by the other plaintiffs. 3 Although Rule 45 does not define the term "lobbyist," it incorporates the statutory definition of "lobbying" contained in the Rhode Island Lobbying Act, R.I. Gen. Laws 22-10-1 to 22-10-12 (the Act). The Act defines "lobbying" as "acting directly or soliciting others to act for the purpose of promoting, opposing, amending, or influencing in any manner the passage by the general assembly of any legislation or the action on that legislation by the governor." Id. 22-10-2. The Act ___ requires lobbyists for private organizations and interests to register with the Secretary of State, see id. 22-10-5 & 22-10- ___ ___ 6, and to wear identifying badges, see id. 22-10-8. Government ___ ___ officials who lobby are given considerably more leeway. The Act grants safe passage to many elected officials, see id. 22-10- ___ ___ 3(1), and other public employees, while required to register, are otherwise exempt from the Act's provisions. See id. 22-10-4.1. ___ ___ Neither elected officials nor other public employees are required to wear identification badges. The district court found that, prior to the adoption of Rule 45, the House provided two galleries overlooking the chamber which were accessible to all members of the public, lobbyists included. In addition, "representatives of both private and governmental organizations were allowed to be present on the floor of the House." Social Workers, 874 F. Supp. at 535. These ______________ lobbyists typically occupied seats on the periphery, in an area ranged alongside the two outermost aisles of the House floor. They communicated with legislators in a variety of ways, such as 4 by whispered conversations on the perimeter of the House floor, written notes, physical gestures, and other assorted signals. See id. This buzznacking took place even while the members were ___ ___ debating floor amendments. After the adoption of Rule 45, access to the overhead galleries remained unchanged. But from that point forward, the House excluded private lobbyists (easily recognized by their obligatory identification badges) from the House floor while the House was in session. The district court found that, in contrast, "agents or employees of governmental bodies [were] allowed to be present on the floor of the House while it [was] in session, as [were] members of the general public." Id. ___ Moreover, the "defendants permitted agents of governmental organizations to be present, to speak, to respond to questions, to provide information, and to confer with legislators on the House floor during House sessions on frequent occasions," notwithstanding the apparently unconditional text of Rule 45. Id. at 537. ___ The plaintiffs struck back on April 27, 1993. On that date, they filed a civil action under 42 U.S.C. 1983 (1988) against Messrs. Harwood and Petteruti (as the individuals purportedly responsible for enforcing the House's rules) charging that Rule 45, on its face and as applied, violated the plaintiffs' rights under the First and Fourteenth Amendments. The defendants denied the allegations. Following a four-day bench trial, the judge found for the plaintiffs. See National ___ ________ 5 Ass'n of Social Workers v. Harwood, 860 F. Supp. 943 (D.R.I. _________________________ _______ 1994). The defendants then moved to alter the judgment. While that motion was under advisement, we decided AIDS Action Comm. v. _________________ Massachusetts Bay Transp. Auth., 42 F.3d 1 (1st Cir. 1994). The ________________________________ judge then issued the opinion that is now before us, 874 F. Supp. 530, modifying the original rescript in certain particulars. In substance, the court found that the presence of the general public on the perimeter of the House floor a presence expressly permitted by Rule 45 constituted "communicative and expressive activity," id. at 540; that, due to the communicative ___ possibilities inherent in physical presence, the public's access to the perimeter of the House floor rendered the floor itself a limited-purpose public forum, see id.; and that, therefore, both ___ ___ Rule 45's exclusion of lobbyists and its proscription against lobbying on the House floor constituted impermissible time, place, and manner restrictions on expressive activity, see id. at ___ ___ 540-41.3 On this basis, the court held that Rule 45, on its  ____________________ 3In the court's view, the rule did not "leave open ample alternative means of communication for the lobbyists," Social ______ Workers, 874 F. Supp. at 541, because "representatives elected to _______ the Rhode Island House of Representatives are part time legislators . . . [who] lack legislative office quarters in the State House or elsewhere, [and who] lack legislative staffs, and [who] generally have full time jobs in addition to their legislative duties." Id. This meant, the court reasoned, that ___ exclusion of the lobbyists denied them the opportunity to communicate with hard-to-find legislators by way of silent presence. See id. ___ ___ In condemning the ban on lobbying on the House floor during House sessions, the court took a similar tack. It found that, "with regard to floor amendments, which are often proposed and voted on in the same House proceeding, the only timely and useful communication that can take place is that which occurs on the floor of the House, during the debate on the amendment." Id.  ___ 6 face, violated the plaintiffs' First Amendment rights. See id. ___ ___ at 541. The court also found that the House haphazardly enforced Rule 45, allowing lobbying by government officials while prohibiting others from lobbying. See id. at 535-37. Predicated ___ ___ on this finding, the court concluded that "the application of Rule 45 amounts to a content based restriction on speech." Id. ___ at 541. Because the court could discern no "compelling government interest" that justified the exclusion of private lobbying while sparing governmental lobbying, it held the interpretation and enforcement of Rule 45 invalid under the First Amendment. Id. at 541-42. ___ In constructing a remedy, the judge, presaging an issue not yet raised by the parties, voiced concerns about judicial interference in legislative affairs. See id. at 542. He ___ ___ therefore declined the plaintiffs' invitation to "require defendants to return to the pre-1993 practice of admitting all lobbyists, public and private, onto the floor of the House on a first-come, first-served basis." Id. Instead, he opted to ___ declare "the current interpretation and enforcement of Rule 45 unconstitutional," and to order the House to refrain from "continuing its current practices with regard to this issue." Id. at 543.4 The House leadership responded on two levels: the ___  ____________________ 4For reasons that are not readily apparent to us, the plaintiffs never sued the House as a body and, therefore, the district court plainly lacked jurisdiction to enjoin the House. The plaintiffs now concede that, insofar as the lower court purported to do so, its order cannot stand. Withal, the 7 House itself passed a new rule barring all persons except legislators and legislative aides from the House floor, and the named defendants launched this appeal. II. PROCEDURAL DEFAULT II. PROCEDURAL DEFAULT On appeal, the defendants, having engaged new counsel, advance a point that, for some unfathomable reason, they neglected to raise below: the claim that, with regard to the defendants' actions anent Rule 45, they are safeguarded from judicial interference under the federal common law doctrine of absolute legislative immunity. The State of Rhode Island, through its Attorney General, as amicus curiae, lends its support. It is very late in the day to bring a new argument to the fore. Ordinarily, an appellant who has not proffered a particular claim or defense in the district court "may not unveil it in the court of appeals." United States v. Slade, 980 F.2d _____________ _____ 27, 30 (1st Cir. 1992). This rule is deeply embedded in our jurisprudence, see, e.g., Teamsters, Chauffeurs, Warehousemen and ___ ____ _______________________________________ Helpers Union, Local No. 59 v. Superline Transp. Co., 953 F.2d ____________________________ ______________________ 17, 21 (1st Cir. 1992) ("If any principle is settled in this circuit, it is that, absent the most extraordinary circumstances, legal theories not raised squarely in the lower court cannot be broached for the first time on appeal."), and we have invoked it  ____________________ plaintiffs argue that the court's underlying ruling that Rule 45 is unconstitutional may endure, as the court had jurisdiction over the individuals charged with the rule's enforcement. For reasons which more clearly appear infra, we _____ need not unsnarl this tangle. 8 with a near-religious fervor, see, e.g., McCoy v. Massachusetts ___ ____ _____ _____________ Inst. of Technology, 950 F.2d 13, 22 (1st Cir. 1991) (collecting ____________________ cases), cert. denied, 504 U.S. 910 (1992). Nor can this variant _____ ______ of the raise-or-waive principle be dismissed as a pettifogging technicality or a trap for the indolent; the rule is founded upon important considerations of fairness, judicial economy, and practical wisdom. See, e.g., Sandstrom v. Chemlawn Corp., 904 ___ ____ _________ ______________ F.2d 83, 87 (1st Cir. 1990); United States v. Miller, 636 F.2d _____________ ______ 850, 853 (1st Cir. 1980). Thus, parties must speak clearly in the trial court, on pain that, if they forget their lines, they will likely be bound forever to hold their peace. This is as it should be: the rule fosters worthwhile systemic ends and courts will be the losers if they permit it to be too easily evaded. But foolish consistency is reputedly the hobgoblin of little minds, see Ralph Waldo Emerson, "Self Reliance," in ___ __ Essays: First Series (1841), and in the last analysis, this _______________________ articulation of the raise-or-waive principle, though important, is a matter of discretion. See United States v. La Guardia, 902 ___ _____________ __________ F.2d 1010, 1013 (1st Cir. 1990) (holding that "an appellate court has discretion, in an exceptional case, to reach virgin issues"); accord Singleton v. Wulff, 428 U.S. 106, 121 (1976); United ______ _________ _____ ______ States v. Mercedes-Amparo, 980 F.2d 17, 18-19 (1st Cir. 1992); ______ _______________ United States v. Krynicki, 689 F.2d 289, 291-92 (1st Cir. 1982). ______________ ________ Thus, this rule (like most rules) admits of an occasional exception. "Occasional" is the key word. Since exceptions must be few and far between, an appellate court's discretion should 9 not be affirmatively exercised unless the equities heavily preponderate in favor of such a step. In the La Guardia and Krynicki opinions, we set forth __________ ________ guidelines that suggest when it may be appropriate to invoke the exception, and we need not rehearse the litany. Instead, we explain why those criteria are satisfied here, and, in the process, explicate the criteria themselves. First, this is not a case in which, by neglecting to raise an issue in a timely manner, a litigant has deprived the court of appeals of useful factfinding. The court below made a number of findings as to the appellants' conduct in interpreting and enforcing Rule 45, and addressing the omitted issue requires only that we determine whether the described conduct, giving full deference to these factual findings, falls within the established boundaries of legislative immunity. Thus, it can fairly be said that the omitted issue is purely legal in nature, and lends itself to satisfactory resolution on the existing record without further development of the facts. These attributes ease the way for invoking the exception. See La Guardia, 902 F.2d at 1013; ___ __________ Krynicki, 689 F.2d at 291-92. ________ Second, appellants' belated proffer "raises an issue of constitutional magnitude," a factor that favors review notwithstanding the procedural default. La Guardia, 902 F.2d at __________ 1013. Third, the omitted argument is "highly persuasive," Krynicki, 689 F.2d at 292, a circumstance that "often inclines a ________ court to entertain a pivotal argument for the first time on 10 appeal," La Guardia, 902 F.2d at 1013, particularly when ___________ declining to reach the omitted argument threatens "a miscarriage of justice," Krynicki, 689 F.2d at 292.5 Fourth, we see no ________ special prejudice or inequity to the plaintiffs. The omitted defense is law-based, not fact-based. In addition, the parties have joined issue; the claim of legislative immunity was made in full in the appellants' opening brief in this court, the plaintiffs responded to it in extenso, and both sides addressed __ _______ the point during oral argument. The absence of unfairness has a definite bearing on a decision to overlook this type of procedural default. See United States v. Doe, 878 F.2d 1546, ___ ______________ ___ 1554 (1st Cir. 1989); cf. Singleton, 428 U.S. at 120 (discussing ___ _________ importance, in determining whether to reach the merits of an omitted issue, of ensuring that the opposing party "ha[s] the opportunity to present whatever legal arguments he may have" to the court of appeals). Fifth, the omission seems entirely inadvertent rather than deliberate; although withholding the argument had the regrettable effect of blindsiding the district  ____________________ 5In this context, "miscarriage of justice" means more than the individualized harm that occurs whenever the failure seasonably to raise a claim or defense alters the outcome of a case. Rather, courts ordinarily will relax the raise-or-waive principle on this basis only if a failure to do so threatens the frustration of some broadly important right. See Schlesinger v. ___ ___________ Councilman, 420 U.S. 738, 743 (1975) (holding that, when __________ "jurisdictional and equity issues . . . [are] sufficiently important," courts may consider issues on appeal that were not raised below); Krynicki, 689 F.2d at 292 (explaining that the ________ interest at stake must be "legitimate and significant"). For this reason, courts often are more prone to make the infrequent exception in cases that involve a discernible public interest, and less prone to do so in disputes between private parties. 11 judge and needlessly prolonging the litigation, it yielded no tactical advantage to the defendants. Sixth and perhaps most salient the omitted issue implicates matters of great public moment, and touches upon policies as basic as federalism, comity, and respect for the independence of democratic institutions. Courts must be sensitive to such concerns. See Stone v. City and County of San ___ _____ _______________________ Francisco, 968 F.2d 850, 855 (9th Cir. 1992) (explaining the _________ court's election to address a matter first raised on appeal because "[i]ssues touching on federalism and comity may be considered sua sponte"), cert. denied, 113 S. Ct. 1050 (1993). _____ ______ We believe that this sensitivity is appropriately expressed by a frank recognition that, when institutional interests are at stake, the case for the favorable exercise of a court's discretion is strengthened, and waiver rules ought not to be applied inflexibly.6 See, e.g., Hoover v. Wagner, 47 F.3d 845 ___ ____ ______ ______ (7th Cir. 1995) (suggesting that "when matters of comity are involved, the ordinary doctrines of waiver give way"); Jusino v. ______  ____________________ 6Our belief that the defendants should not be strictly held to a waiver of their absolute legislative immunity in this case is fortified by our recognition that a primary purpose of the immunity is to prevent courts from intruding into precincts that are constitutionally reserved to the legislative branch. Overlooking a waiver in order to further this policy of non- interference is analogous to our settled rule that, because federal courts are courts of limited jurisdiction, the absence of federal subject matter jurisdiction can be raised on appeal even if the issue was not raised below. See, e.g., American ___ ____ ________ Policyholders Ins. Co. v. Nyacol Prods., Inc., 989 F.2d 1256, _______________________ ____________________ 1258 (1st Cir. 1993), cert. denied, 114 S. Ct. 682 (1994). In _____ ______ both situations, looking past the waiver has the salutary effect of ensuring that federal courts do not poach on preserves that the Constitution reserves to other forms of oversight. 12 Zayas, 875 F.2d 986, 993 (1st Cir. 1989) (discussing court's _____ reluctance to apply waiver rules concerning "a line of defense that calls into play the Commonwealth's Eleventh Amendment immunity"); cf. Granberry v. Greer, 481 U.S. 129, 134 (1987) ___ _________ _____ (explaining that, when a state fails to raise a nonexhaustion claim in a federal habeas proceeding, the federal tribunal nonetheless should consider "whether the interests of comity and federalism will be better served . . . by requiring [exhaustion]"). Here, an important issue of public concern confronts us. It is presented belatedly, but in a posture that permits its proper resolution on the existing record and works no unfair prejudice to the opposing parties. Failure to address the issue may well result in an unwarranted intrusion by a federal court into the internal operations of a state legislature. Under these exceptional circumstances, we follow the course of perceived duty and proceed, in the exercise of our discretion, to weigh the legislative immunity argument.7 See La Guardia, 902 F.2d at ___ __________  ____________________ 7The dissent's principal response to this reason seems to be that overlooking the waiver "eliminates any incentive" for legislators to raise the immunity defense in a timely manner. Post at 39-40. This reasoning strikes us as triply flawed. In ____ the first place, that argument can be used with equal force as to virtually all omitted defenses; its logical extension is that all waivers should rigorously be enforced. That view has much to commend it as a matter of case management, but, as La Guardia, ___________ Krynicki, Mercedes-Amparo, Hoover, and Stone illustrate, it is ________ _______________ ______ _____ simply not the law. In the second place, the argument underestimates the capabilities of appellate courts. There is no hint of a deliberate bypass in this case the belated tender of the defense is the product of a change in counsel (coupled with the appearance of Rhode Island's Attorney General as an amicus) 13 1013 ("Rules of practice and procedure are devised to promote the ends of justice, not to defeat them.") (quoting Hormel v. ______ Helvering, 312 U.S. 552, 557 (1941)). _________ III. THE MERITS OF THE OMITTED DEFENSE III. THE MERITS OF THE OMITTED DEFENSE We bifurcate our analysis of the legislative immunity defense, first discussing the general nature and scope of the doctrine and then addressing the specific contours of the appellants' claim. A. Legislative Immunity: In General. A. Legislative Immunity: In General. _________________________________ The Speech or Debate Clause commands that "for any Speech or Debate in either House, [Senators and Representatives] shall not be questioned in any other place." U.S. Const. art. I, 6, cl. 1. The Clause is, by its terms, limited to members of Congress. See Lake County Estates v. Tahoe Regional Planning ___ ____________________ ________________________ Agency, 440 U.S. 391, 404 (1979). Nevertheless, state ______ legislators and their surrogates enjoy a parallel immunity from liability for their legislative acts. While this immunity is derived from federal common law, it is similar in scope and object to the immunity enjoyed by federal legislators under the Speech or Debate Clause. When the Justices initially recognized state legislative immunity as a  ____________________ rather than a change in tactics or a reassessment of political costs and, if sandbagging were to occur, we have confidence that this court would see it for what is was, and decline to exercise discretion in favor of the sandbagger. Finally, if we assume that the dissent is correct and that our ruling today may encourage legislator-litigants to withhold immunity defenses for political reasons, that is still the lesser evil, far preferable in our view to the unwarranted insertion of the federal court's nose into the state legislature's tent. 14 component of federal common law, they turned to the Speech or Debate Clause for guidance anent the contours of the doctrine. See Tenney v. Brandhove, 341 U.S. 367, 376-79 (1951). Later, the ___ ______ _________ Court acknowledged that the immunities enjoyed by federal and state legislators are essentially coterminous. See Supreme Court ___ _____________ of Va. v. Consumers Union of the U.S., Inc., 446 U.S. 719, 732-33 ______ _________________________________ (1980). Hence, our exploration of the appellants' legislative immunity claim begins with a distillation of principles extracted from federal constitutional jurisprudence. The Speech or Debate Clause has its roots in a similar provision found in the English Bill of Rights of 1689.8 See ___ United States v. Johnson, 383 U.S. 169, 177-78 (1966); Tenney, _____________ _______ ______ 341 U.S. at 372. The Clause is modeled to ensure that the Legislative Branch will be able to perform without undue interference the whole of the legislative function ceded to it by the Framers. See Eastland v. United States Serviceman's Fund, ___ ________ ________________________________ 421 U.S. 491, 502 (1975). To that end, the Clause operates to shelter individual legislators from the distractions and hindrance of civil litigation, see id. at 503, and "immunizes ___ ___ [them] from suits for either prospective relief or damages," Consumers Union, 446 U.S. at 731. _______________ While the core protection conferred by the Clause concerns speech or debate by a member of Congress on the floor of  ____________________ 8The British version provides: "That the Freedom of Speech, and Debates or Proceedings in Parliament, ought not to be impeached or questioned in any Court or Place out of Parliament." 1 Wm. & Mary, Sess. 2, ch. II (1689). 15 either the Senate or the House, see Gravel v. United States, 408 ___ ______ _____________ U.S. 606, 625 (1972), the penumbra of the Clause sprawls more broadly. This breadth of application, which draws its essence from the Supreme Court's espousal of a "practical rather than a strictly literal reading" of the Clause, Hutchinson v. Proxmire, __________ ________ 443 U.S. 111, 124 (1979), is made manifest in two ways. For one thing, the Clause's prophylaxis extends to any act "generally done in a session of the House by one of its members in relation to the business before it." Kilbourn v. Thompson, 103 U.S. 168, ________ ________ 204 (1880). So read, the Clause protects not only speech and debate per se, but also voting, see id., circulation of ___ ___ information to other legislators, see Doe v. McMillan, 412 U.S. ___ ___ ________ 306, 312 (1973), participation in the work of legislative committees, see Gravel, 408 U.S. at 624; Tenney, 341 U.S. at 378- ___ ______ ______ 79, and a host of kindred activities. For another thing, because the applicability of the Speech or Debate Clause necessarily focuses on particular acts or functions, not on particular actors or functionaries, the prophylaxis of the Clause also extends to legislative acts performed by non-legislators. See Eastland, 421 U.S. at 507 ___ ________ (refusing to draw a distinction between the members of a congressional subcommittee and the subcommittee's counsel when the latter's actions were within the sphere of legitimate legislative activity); Gravel, 408 U.S. at 618 (holding that "the ______ Speech or Debate Clause applies not only to a Member but also to his aides insofar as the conduct of the latter would be a 16 protected legislative act if performed by the Member himself"). This extension evinces a recognition that, as a practical matter, legislators cannot be expected to perform their constitutionally allocated tasks without staff support. This is not to say that the protections afforded by the Speech or Debate Clause are limitless. They are not. See ___ Gravel, 408 U.S. at 625. Although the Court has read the Clause ______ generously, its protections must match its purposes. See ___ Eastland, 421 U.S. at 501-02. When all is said and done, the ________ absolute immunity conferred by the Clause is not afforded "simply for the personal or private benefit of Members of Congress, but to protect the integrity of the legislative process by insuring the independence of individual legislators." United States v. ______________ Brewster, 408 U.S. 501, 507 (1972). ________ The key limitation which applies both to members of Congress and to congressional staffers is that the Clause protects "only purely legislative activities." Id. at 512. If a ___ legislator (or his surrogate) undertakes actions that are only "casually or incidentally related to legislative affairs," id. at ___ 528, or which fall outside the "legitimate legislative sphere," Eastland, 421 U.S. at 503 (citation omitted), no immunity ________ inheres. By the same token, the mere fact that a legislator or a legislative aide performs an act in his official capacity does not automatically confer protection under the Speech or Debate Clause. See Gravel, 408 U.S. at 625. For example, when a member ___ ______ of Congress disseminates press releases to the public, the Clause 17 does not attach because such documents are "primarily means of informing those outside the legislative forum." Hutchinson, 443 __________ U.S. at 133. So, too, activities that are more political than legislative in nature do not come within the legislative sphere, and, hence, do not implicate the Speech or Debate Clause. See ___ Brewster, 408 U.S. at 512. These activities include such ________ familiar fare as "legitimate `errands' performed for constituents, the making of appointments with Government agencies, [and] assistance in securing Government contracts." Id. ___ B. Legislative Immunity: In Particular. B. Legislative Immunity: In Particular. ____________________________________ We now turn to the merits of appellants' assertion that, under federal common law, the instant action founders on the shoals of absolute legislative immunity. The plaintiffs brought suit, as we have said, under 42 U.S.C. 1983. In actions invoking federal civil rights statutes, federal courts customarily "equate[] the legislative immunity to which state legislators are entitled . . . to that accorded Congressmen under the Constitution." Consumers Union, 446 U.S. at 733. Viewed _______________ against this backdrop, it is unsurprising that the courts of appeals historically have relied on Speech or Debate Clause precedents to define the doctrinal boundaries of state legislative immunity under the federal common law. See, e.g., ___ ____ Schlitz v. Commonwealth of Va., 854 F.2d 43, 45-46 (4th Cir. _______ ____________________ 1988); Agromayor v. Colberg, 738 F.2d 55, 58-59 (1st Cir.), cert. _________ _______ _____ denied, 469 U.S. 1037 (1984); Colon Berrios v. Hernandez Agosto, ______ _____________ ________________ 18 716 F.2d 85, 89-90 (1st Cir. 1983) (per curiam); Green v. DeCamp, _____ ______ 612 F.2d 368, 371-72 (8th Cir. 1980). Thus, our mode of analysis dovetails with the Speech or Debate Clause cases. At the heart of our inquiry lies the question of whether appellants' acts in respect to Rule 45 are "part and parcel of the legislative process." Gravel, 408 U.S. at 626. If ______ so, appellants are protected. See id. To answer this question, ___ ___ we must understand the nature of the acts.9 We can look at them in one of two ways. In a general sense, the defendants the Speaker and the head doorkeeper did nothing more or less than to interpret and enforce Rule 45. Where, as here, a legislative body adopts a rule, not invidiously discriminatory on its face, see infra pp. ___ _____ 26-28, that bears upon its conduct of frankly legislative business, we think that the doctrine of legislative immunity must protect legislators and legislative aides who do no more than carry out the will of the body by enforcing the rule as a part of  ____________________ 9In certain types of cases, the legislative immunity analysis centers on function, attempting to ascertain whether an action by one or more legislators is administrative or legislative in nature. See, e.g., Negron-Gaztambide v. ___ ____ _________________ Hernandez-Torres, 35 F.3d 25, 27-28 (1st Cir. 1994) (holding that ________________ legislators' decision to discharge librarian was administrative in nature, and did not give rise to legislative immunity). Here, however, we are dealing with a procedural rule adopted by a house of the legislature as a whole for the management of its own business. Hence, we are not concerned with whether the adoption of the rule comprises a legislative act that is transparently clear but, rather, with whether that act is more than "casually or incidentally related" to core legislative functions. Brewster, 408 U.S. at 528. ________ 19 their official duties.10 See Consumers Union of the U.S. v. ___ _____________________________ Periodical Correspondents' Ass'n, 515 F.2d 1341, 1348-50 (D.C. _________________________________ Cir. 1975) (holding congressional employees' actions in enforcing Congress's internal seating regulations immune under Speech or Debate Clause), cert. denied, 423 U.S. 1051 (1976); see also _____ ______ ___ ____ Davids v. Akers, 549 F.2d 120, 123 (9th Cir. 1977) (dismissing ______ _____ action challenging internal rules for committee assignments brought by members of the Arizona House of Representatives against the Speaker); cf. R.I. Const. art. VI, 7 (expressly ___ authorizing the House to "determine its rules of proceeding"). The short of it is that the doctrine of legislative immunity, like the Speech or Debate Clause, attaches when solons' actions are "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters [committed to their jurisdiction]." Gravel, 408 U.S. at ______ 625. In a more specific sense, it might be said that the  ____________________ 10We reject the plaintiffs' attempt to differentiate the Speaker from the doorkeeper, based on the fact that the latter is not a legislator. The case law teaches that, as long as an aide's conduct would be covered by legislative immunity were the same conduct performed by the legislator himself, the aide shares the immunity. See Eastland, 421 U.S. at 507; Gravel, 408 U.S. at ___ ________ ______ 616; Consumers Union of the U.S. v. Periodical Correspondents' _____________________________ __________________________ Ass'n, 515 F.2d 1341, 1348-50 (D.C. Cir. 1975), cert. denied, 123 _____ _____ ______ U.S. 1051 (1976). Petteruti's actions in keeping the House floor unsullied were performed by virtue of an express delegation of authority to him as part of the House's staff support apparatus, under the auspices of the Speaker and the legislative body as a whole. No more is exigible. 20 district court granted relief because it found Rule 45 to be fatally deficient in three particulars: (1) on its face, Rule 45 transgressed the First Amendment by banning lobbying on the floor of the House while the House is in session; (2) on its face, Rule 45 transgressed the First Amendment by banishing all lobbyists from the perimeter of the House; and (3) the appellants interpreted, applied, and enforced Rule 45 to allow governmental lobbyists onto the House floor while denying comparable access to private lobbyists. Assuming for argument's sake that this narrower perspective is relevant, the question of whether the appellants are entitled to legislative immunity would be reduced to a question of whether the acts which the district court found problematic fell within or without "the legitimate legislative sphere." Eastland, 421 U.S. at 503. ________ The first area of inquiry can celeritously be dispatched. We think it is beyond serious dispute that enforcing a duly enacted legislative rule which prohibits lobbying on the House floor during House sessions is well within the legislative sphere. Such a restriction necessarily affects the manner in which the House conducts its most characteristic legislative functions, e.g., debating and voting. A rule that colors the ____ very conditions under which legislators engage in formal debate is indubitably part and parcel of the legislative process, and the acts of House officials (whether or not elected members) in enforcing it are therefore fully protected against judicial interference by the doctrine of legislative immunity. See id.; ___ ___ 21 see also Doe, 412 U.S. at 312-13; Tenney, 341 U.S. at 378-79. ___ ____ ___ ______ At first blush, the next area of inquiry whether the exclusion of all lobbyists from the perimeter of the House is within the legislative sphere appears more murky. Seating arrangements for non-legislators arguably are less integral to the legislative process than the regulation of lobbying during House sessions. As the trial testimony in this case amply demonstrates, however, when lobbyists are present on the House floor (even on the perimeter), they often become embroiled in the legislative process either through self-initiated or legislator- initiated contacts. And, even if lobbyists are able to maintain stoic silence on the perimeter, their mere presence affects the legislative environment.11 We conclude, therefore, that regulation of admission to the House floor comprises "an integral part of the deliberative and communicative processes by which Members participate in . . . House proceedings with respect to the consideration and passage or rejection of proposed legislation." Gravel, 408 U.S. at 625. Consequently, the ______ doctrine of legislative immunity pertains. We are not alone in our view of a legislature's House  ____________________ 11The plaintiffs themselves have argued, in the context of their First Amendment claim, that they should at least be given the opportunity to sit silently on the perimeter of the House floor so that they may communicate through their physical presence. The district court accepted this argument, and made it a cornerstone of the ensuing First Amendment analysis. See ___ Social Workers, 874 F. Supp. at 539-41. The importance that the ______________ plaintiffs attach to admittance to the perimeter indicates their own recognition that, by mere physical presence, they can influence ongoing legislative business. 22 as its castle. In Periodical Correspondents', the court reached __________________________ a similar conclusion. There, the Periodical Correspondents' Association, which issues credentials to the press galleries of Congress, denied accreditation to a particular periodical, Consumer Reports, on the ground that it had ties to an advocacy organization. Consumers Union sued the sergeants-at-arms of the House and Senate, among other defendants, alleging that the exclusion violated the First Amendment. The court held that the sergeants-at-arms were immune under the Speech or Debate Clause because arrangements for seating the press in the House and Senate galleries were "integral" to "the legislative machinery." 515 F.2d at 1350. In a later case, the court elaborated its rationale, explaining that the seating "immediately concerned House consideration of proposed legislation" because the arrangements "were intended to shield members of Congress from press members' use of their House access to lobby legislators." Walker v. Jones, 733 F.2d 923, 930 (D.C. Cir.) (discussing ______ _____ Periodical Correspondents'), cert. denied, 469 U.S. 1036 (1984). __________________________ _____ ______ Like the seating arrangements at issue in Periodical __________ Correspondents', the seating arrangements dictated by Rule 45 _______________ involve the "regulation of the very atmosphere in which lawmaking deliberations occur." Walker, 733 F.2d at 930. Moreover, if ______ there is a distinction between Periodical Correspondents' and the __________________________ instant case, it does not advantage the present plaintiffs; the Rhode Island House is seeking to regulate access to its own floor, rather than to galleries located above the floor. 23 We come now to the third area of inquiry, involving the significance, if any, of the plaintiffs' claim that the appellants interpreted and enforced Rule 45 in a manner that allowed lobbying on the House floor by governmental, but not private, lobbyists. This as-applied exclusion of private lobbyists, at its most primitive level, involves regulating the legislative environment by controlling access to the seating on the perimeter of the House floor. Because such regulation is "done in a session of the House by one of its members in relation to the business before it," Kilbourn, 103 U.S. at 204, it is ________ within the legislative sphere. To be sure, both our dissenting colleague and the plaintiffs protest that the House treats private lobbyists differently (and less hospitably) than public lobbyists, and that this differential treatment offends the First Amendment. These charges lack sufficient force to strip away the shield of absolute legislative immunity. We believe that the body of our opinion adequately rebuts the dissent's views, and we decline to repastinate well- ploughed ground. We do add, however, our belief that the dissent seriously misconstrues the Court's Speech or Debate Clause jurisprudence beyond all recognition. To the extent that Powell ______ can be read to hold that legislative immunity does not extend to legislative employees, the Court in later cases has routinely confined it to its unique facts. See, e.g., Gravel, 408 U.S. at ___ ____ ______ 621 (specifically identifying Kilbourn, Powell, and Dombrowski v. ________ ______ __________ 24 Eastland, 387 U.S. 82 (1967), and stating that none "of these ________ cases adopted the simple proposition that immunity was unavailable to congressional or committee employees because they were not Representatives or Senators"). Rather, the case law "reflect[s] a decidedly jaundiced view towards extending the Clause so as to privilege illegal or unconstitutional conduct beyond that essential to foreclose executive control of legislative speech or debate and associated matters such as voting and committee reports and proceedings." Id. We see no ___ reason why judicial control of legislative speech or debate is any less pernicious than executive control. Moreover, the decision not to extend legislative immunity to congressional employees in cases such as Powell turned on whether "relief could ______ be afforded without proof of a legislative act or the motives or purposes underlying such an act," thereby avoiding impermissible encroachment on "legislative independence." Id. at 620. Under ___ that standard, judicial review of House Rule 45 as the tortured course of the proceedings below graphically illustrates  unquestionably required a substantial judicial intrusion into the legislative domain. Finally, we recognize, as the dissent points out, that the Court has remarked an exception to legislative immunity for the exercise by legislators of punitive enforcement ________ authority outside the ambit of purely legislative proceedings. See Consumers Union, 446 U.S. at 736. But the Court has never ___ ________________ suggested, much less held, that the enforcement of a rule adopted by an entire legislative body designed to govern the conduct of 25 legislative proceedings falls within that exception. If that were the rule, legislative immunity would be little more than a rumor, and the Speech or Debate Clause would be easily skirted. Similarly, the plaintiffs' "as-applied" arguments are unavailing. In Eastland v. United States Servicemen's Fund, ________ _________________________________ supra, the plaintiffs asseverated that "once it is alleged that _____ First Amendment rights may be infringed by congressional action the Judiciary may intervene to protect [First Amendment] rights." 421 U.S. at 509. The Court flatly rejected this asseveration, warning that the effort to carve out such an exception "ignores the absolute nature of the speech or debate protection and [the] cases which have broadly construed that protection." Id. at 509- ___ 10. The Court added: "Where we are presented with an attempt to interfere with an ongoing activity by Congress, and that activity is found to be within the legitimate legislative sphere, [First Amendment] balancing plays no part." Id. at 510 n.16. The Ninth ___ Circuit put matters even more bluntly, writing that "nothing in the First or Fourteenth Amendments or in 42 U.S.C. 1983 . . . can justify [an] attempt to inject the Federal Judiciary into the internal procedures of a House of a state legislature." Davids, ______ 549 F.2d at 123. The plaintiffs' also assert that the differential treatment of public and private lobbyists violates the Equal Protection Clause. This assertion does not derail the engine of legislative immunity. Activities that comprise part and parcel of the legislative process are protected by legislative immunity; 26 that immunity is not forfeited simply because the activities, if unprotected, might violate a plaintiff's constitutional rights. See Doe, 412 U.S. at 312-13; see also Colon Berrios, 716 F.2d at ___ ___ ___ ____ _____________ 91. Thus, in Doe, the Supreme Court ruled that the Speech or ___ Debate Clause shields legislators' actions "within the legislative sphere, even though [the] conduct, if performed in other than legislative contexts, would in itself be unconstitutional." 412 U.S. at 312-13 (internal citation and quotation marks omitted). For obvious reasons, the plaintiffs chafe at the broad sweep of the doctrine of legislative immunity, and, in struggling to make their point, they marshal a parade of horribles. To cite a typical example, they raise the specter of a hypothetical legislature that votes to allow access to its chambers to members of only one race or to adherents of only one religion. The plaintiffs have the right to march, but their parade is on the wrong route. The Court has explicitly recognized that there may be some conduct, even within the legislative sphere, that is so flagrantly violative of fundamental constitutional protections that traditional notions of legislative immunity would not deter judicial intervention. See, e.g., Kilbourn, 103 U.S. at 204 (leaving open the question ___ ____ ________ of whether "there may not be things done, in the one House or the other, of an extraordinary character, for which the members who take part in the act may be held legally responsible"); see also ___ ____ Tenney, 341 U.S. at 379 (Black, J., concurring) (recognizing that ______ 27 the Court's jurisprudence "indicates that there is a point at which a legislator's conduct so far exceeds the bounds of legislative power that he may be held personally liable in a suit brought under the Civil Rights Act"). Whatever may be the outer limits of the doctrine of legislative immunity, however, it is clear that the instant case is not so extreme as to cross (or even closely approach) the border. Taking the district court's factual findings at face value, Rule 45, as applied, may arguably be wrong as a matter of policy and as a matter of constitutional law but it is not invidiously discriminatory. To the contrary, the differentiation between private and public lobbyists appears to be based on two factors that bear some rational relationship to legitimate ____ legislative purposes. First, the House leadership explained that, in its view, the exclusion of private lobbyists from the floor was a useful tool to bolster public confidence in legislative independence and integrity.12 Second, the  ____________________ 12In a debate over a motion to reconsider Rule 45, the Majority Leader, Representative George Caruolo, stated: This isn't trying to retard lobbyists from pursuing their vocation . . . It's a rule that says, quite simply, this is the people's chamber, the public is invited. But the business of the people should be conducted by the people's representatives. It should not be in any way affected by people who are registered to advocate particular positions, whether they are paid or unpaid . . . . Later, Representative Caruolo explained why he thought that governmental lobbyists on the floor of the House do not trigger the same public perceptions as private lobbyists: 28 defendants consistently have taken the position that government lobbyists act in effect as support staff for legislators by giving them neutral statistical and factual information relevant to pending legislation. These justifications for the continued presence of government lobbyists, found by the district court to be authentic (if asthenic), see Social Workers, 874 F. Supp. at ___ ______________ 541-42, afford a sufficiently rational basis to persuade us that this case does not give rise to the question reserved by the Kilbourn Court.13 ________ Thus, we conclude that, insofar as the appellants enforced Rule 45's prohibitions against private lobbyists, but spared governmental lobbyists from exclusion, they acted within the legislative sphere and are protected from judicial  ____________________ [A]ny general officer or any government employee who is here, working in this building [the State House] on government policy they're paid by the government. We are the government. That's the distinction . . . Let's not have private groups out here trying to manipulate this floor while we are taking votes. In the same vein, Edward Clement, the House's legislative coordinator, testified that he did not consider government lobbyists to be lobbyists per se, but, rather, "people called [to the floor] by members of the House for informational purposes." Speaker Harwood echoed the same themes, describing the principal spokesman for the state Budget Office as "a dollars-and-cents guy. . . . a resource factual guy," in contradistinction to "a lobbying, influence guy." 13This conclusion is not undermined by the lower court's determination that these reasons were insufficient to warrant an infringement on the First Amendment rights of private lobbyists. See Social Workers, 874 F. Supp. at 541-42. Such rigorous ___ ______________ testing, appropriate in the First Amendment context, is out of place in the context of legislative immunity. See Eastland, 421 ___ ________ U.S. at 509 n.16. 29 interference by the doctrine of absolute legislative immunity. IV. CONCLUSION IV. CONCLUSION We need go no further.14 In our republican system, different institutions of government occupy different spheres. Within its own domain, the legislative branch of a state government is entitled to a reasonable measure of independence in conducting its internal affairs. As a rule, a legislature's regulation of the atmosphere in which it conducts its core legislative activities debating, voting, passing legislation, and the like is part and parcel of the legislative process, and, hence, not subject to a judicial veto. See Eastland, 421 ___ ________ U.S. at 509. Because Rule 45, and the defendants' actions in interpreting and enforcing it, fit within the sweep of this generality, the doctrine of absolute legislative immunity requires that the federal courts refuse to entertain the suit. Reversed. No costs. Reversed. No costs. ________ ________ Appendix follows; Dissenting opinion follows appendix  Appendix follows; Dissenting opinion follows appendix   ____________________ 14We do not reach and, accordingly, express no opinion on, the soundness of the district court's First Amendment analyses and rulings. 30 APPENDIX APPENDIX Text of Rule 45 Text of Rule 45 _______________ SIXTHLY - OF ADMISSION TO THE FLOOR 45(a) The following persons shall be entitled to admission to the floor of the House during the session thereof: The Governor, the Lieutenant Governor, the Secretary of State, the Attorney General, the General Treasurer, the state controller, and members of the Senate, judges and ex-judges of the United States court and of the state courts, ex- governors, ex-Speakers of the House, ex- members of the General Assembly, representatives of the legislative council, legislative staff, director of the department of administration, the budget officer, assistant in charge of law revision, and clerks of the Senate and House committees, superintendent of public buildings, state librarian, and the authorized representatives of the press, as provided in the rule next following, and such other persons as shall be admitted to the floor by the Speaker. At the discretion of the Speaker, members of the public may be admitted to the House floor, provided, however, that all such persons may not stay in the House chamber unless they remain seated along the sides of the chamber, refrain from conversation, and maintain the decorum of the House. All persons who are unable to access the House galleries by reason of physical handicap shall be entitled to admission to the House floor. (b) Lobbyists including former state legislators who are lobbyists shall not be entitled to admission to the floor of the House during the session thereof. No person entitled to admission to the floor of the House during the session thereof, shall either directly or indirectly engage in the practice of lobbying as defined in Rhode Island General Laws (22-10-2). (c) Admission to the House Lounge is limited to House members and persons invited and accompanied by a House member who will be 31 responsible for them while in the lounge. Such persons when no longer accompanied by the House member with whom they entered, shall leave the lounge. No lobbyists shall be admitted to the House lounge during the House session. 32 LYNCH, Circuit Judge, dissenting. When the LYNCH, Circuit Judge, dissenting. ____________________________ government chooses to listen only to its own voice in the political process by excluding the voices of private citizens, core First Amendment values are violated. At the heart of this case is not the ability of the Rhode Island House to promulgate rules for the conduct of its own business, but the defendants' actual practice, directly contrary to the Rule adopted by the House, of excluding speakers unless they represent the government and thus express the government's own viewpoint. While, in my view, the House could have legitimately closed the floor of its Chamber to all who sought to influence its work, defendants may not permit government lobbyists to lobby on the House floor while prohibiting private citizens and private lobbyists from doing the same. The First Amendment does not permit the government to put its thumb on the scale in this way and favor itself in the arena of political speech. With respect, I dissent. Unlike the majority, I would not take the extraordinary step of affording defendants absolute legislative immunity, thus preventing the court from reaching the First Amendment issue. The majority does so in the name of federalism and comity, important values to be sure. But naming those values may obscure the issues involved here. This case does not implicate traditional issues of -33- 33 "federalism" at all, such as the limits on enumerated congressional powers, see United States v. Lopez, 115 S. Ct. ___ _____________ _____ 1624 (1995), or the relative allocation of legislative power between state and federal governments, see U.S. Term Limits, ___ _________________ Inc. v. Thornton, 115 S. Ct. 1842 (1995). Rather, this case ____ ________ raises thorny issues of the constitutional allocation of powers between the people and those elected to represent them, and of the appropriate role of federal courts in resolving such issues.  Facts _____ Rule 45 on its face does not permit any lobbyists, government or private, to be on the House floor and prohibits lobbying on the floor by anyone, private citizen15 or professional lobbyist, while the House is in session. It is that Rule which reflects the decision of the House as to the running of its affairs. Permitting government lobbyists to lobby on the floor of the House violates the House Rule.  The defendants claimed that such were not their practices. But the district court, after trial, found to the contrary and the defendants have not appealed from that factual determination. The record amply demonstrates that government lobbyists were regularly plying their trade on the  ____________________ 15. Under the terms of Rule 45, certain government officials including the Governor, the Secretary of State, and the Attorney General have access to the floor. The Rule nonetheless prohibits anyone from lobbying. -34- 34 floor after adoption of the House Rule which ostensibly kept them out. And, as the district court found, defendants "flagrantly permitted" such activities. The Rhode Island House presents a factual setting perhaps unique in this country. Unlike many legislative bodies, including the United States Congress, most Rhode Island legislators are part-time and have neither offices nor staff. The House meets for six months or less in a year, and then only for three or four afternoons and evenings a week. Once the session starts, it rarely breaks until it is concluded. Legislators typically arrive just in time for the session and leave immediately on its conclusion. Legislators have no desks other than their desks on the floor of the Chamber. Often there is no other place but the floor for direct communication with the legislators, apart from disturbing legislators in their capacities as private citizens where they live or work. Amendments to bills are often introduced for the first time on the floor. They are often unavailable to the public before being introduced and are available only in the House Chamber after being introduced. Frequently, especially toward the close of the session, the House votes on such an amendment on the same day, and sometimes within minutes, of the amendment being introduced.  -35- 35 Around the perimeter of the floor of the House Chamber are approximately eighteen chairs. Some of those chairs have been filled on a daily basis by government lobbyists since Rule 45 was enacted. The remainder are filled by members of the public. Private lobbyists are relegated to balcony seating. Government officials sitting in the perimeter seats have and use a decided advantage in communicating with legislators and in collecting and disseminating information. Individual legislators frequently walk over to the perimeter to speak with the government lobbyists. These lobbyists send notes to legislators indicating that they would like to speak and they get the attention of individual legislators by signalling them. People seated along the perimeter of the floor receive more information than others concerning floor amendments, which are distributed to the legislators only when they are introduced. Thus, government lobbyists who are sitting on the floor can see copies of floor amendments and have the opportunity to communicate their views, including pertinent information, to the legislators. It is virtually impossible for those who are not permitted onto the floor to learn the exact language of an offered amendment because the text of floor amendments is not distributed outside of the Chamber. -36- 36 Government lobbyists have actively lobbied for their positions both from the perimeter seats and from the floor itself. They have done so on bills which government officials have supported and which private groups have opposed. Those bills often concerned matters of great public debate. For example, the topic of public funding of abortion was taken up by the legislature. Agents of the Governor's office, which supported such funding, sat on the floor and talked to legislators while the lobbyist from the Rhode Island State Right to Life Committee, Inc., which opposed such funding, was relegated to the balcony. Similarly, the Attorney General of Rhode Island introduced a bill to reinstate the death penalty and he and his staff were on the floor during debates on the bill, speaking with legislators. Private group lobbyists opposed to the bill, including those from the Rhode Island Affiliate of the American Civil Liberties Union, could only watch from the balcony and were precluded from the floor and from lobbying. The same duality characterized the influencing of bills on welfare reform. Government lobbyists from the Department of Human Services were present for floor debates on an amendment which would restore a General Public Assistance program cut from the Governor's budget. The Department favored elimination of the program. Lobbyists from the National Association of Social Workers (NASW), which -37- 37 opposed eliminating the program, were excluded. There was no break in the session between the time the amendment was introduced and it was voted upon. Similarly, in debate over an amendment to an AFDC program, lobbyists for the Department in the perimeter seats attempted to influence the vote, while a NASW lobbyist in the balcony ineffectively tried to convey the NASW's position by waving hands. Prison-related bills received the same treatment. Department of Corrections officials were on the floor with legislators during debate while ACLU lobbyists who opposed the Department's position watched ineffectively from the balcony. There were numerous other instances where the Governor's Office, the State Police, the Department of Economic Development, the Banking and Insurance Department, the Fire Marshal, the General Treasurer's Office and the Department of Business Regulation lobbyists spoke directly with legislators on the floor regarding pending legislation.16 Nor were the advantages given to government lobbyists limited to lobbyists from state government agencies. The lobbyist for the Mayor of Providence was on the floor of the House every day, frequently conversing with legislators. She spoke with legislators on issues as varied  ____________________ 16. The ability of government employees to sit in the few perimeter seats may have been used to advance their personal interests as well. For example, during debates on incentive pay for court clerks, two court clerks sat in the aisle seats. -38- 38 as a proposed gun court, the Providence water supply, and funding for the city. Lobbying by government lobbyists at times took place among the seats of the legislators, even with the knowledge of the Speaker. For example, when the House was in session, the Providence lobbyist was on a cellular telephone and walked in between the rows of the legislators' seats, passing the telephone to certain members of the House, who listened and spoke into the telephone. The telephone was eventually passed to the Speaker, who also listened, spoke and chuckled. Only when a member of the House raised an objection did the Providence lobbyist move to the outer aisles. But she was not asked to leave the floor and was not asked to refrain from speaking to the legislators. Immunity ________ I respectfully disagree with the decision of my very able colleagues to afford absolute legislative immunity to both of the defendants. Not only was the defense waived, but even if it had been properly raised, the doctrine of legislative immunity does not, in my view, foreclose a judicial determination of the constitutionality of the defendants' practices. The challenged practices do not constitute the kind of "purely legislative activities" that have traditionally triggered the protections of the legislative immunity bar. Raising that bar in this case is -39- 39 not necessary to vindicate the vital interests that the doctrine was intended to safeguard, and indeed undercuts those interests. This case does not present the kind of exceptional circumstances that would even permit consideration of the defendants' legislative immunity arguments, because those arguments were not raised in the district court. Cf. ___ Eastland v. United States Servicemen's Fund, 421 U.S. 491, ________ ________________________________ 510 n.17 (1975) ("[T]he Speech or Debate Clause has never been read so broadly that legislators are 'absolved of the responsibility of filing a motion to dismiss.'" (citation omitted)); Powell v. McCormack, 395 U.S. 486, 505 n.25 ______ _________ (1969). Here, the immunity doctrine -- hardly an obscure legal concept -- was never raised as a defense to liability, even when the distinguished trial court was solicitous about minimizing the intrusion of the litigation into the functioning of the state legislature. Defendant Harwood is himself an attorney and both defendants were ably represented in the district court. I see no reason not to hold the defendants to their waivers. See Singleton v. Wulff, 428 ___ _________ _____ U.S. 106, 121 (1976) (reversing court of appeals in a civil case for deciding issues not argued in the district court). In reaching the immunity issue, the majority sets up a virtually no-lose proposition for legislators. Legislators are certainly cognizant of the public perception -40- 40 that raising an immunity defense is tantamount to a claim of being above the Constitution. Thus, raising a defense of legislative immunity at the outset of litigation is not without its political costs. The majority's approach, which permits the defense to be raised after trial, virtually _____ eliminates any incentive to raise it sooner. If the trial were to produce an unfavorable outcome, the legislator- defendant could simply assert immunity on appeal, claiming that the failure to raise the defense earlier had been inadvertent. Because there rarely will be direct evidence to counter such a claim of inadvertence, and because the defense of absolute legislative immunity will always present a law- based, potentially dispositive question of constitutional magnitude, a court of appeals applying the majority's approach would almost inevitably consider the defense, even though raised for the first time on appeal. Moreover, to the extent that one of the rationales underlying legislative immunity is to prevent vexatious litigation against legislators, that rationale is undermined where (as here) the legislator-defendant goes through the entire trial and raises the defense only on appeal. "The purpose of the protection afforded legislators is not to forestall judicial review of legislative action but to insure that legislators are not distracted from or hindered in the performance of their legislative tasks by being called into -41- -41- court to defend their actions." Powell, 395 U.S. at 505. ______ Denials of legislative immunity are immediately appealable because the immunity is not simply a defense to liability but is also an immunity from suit. Helstoski v. Meanor, 442 U.S. _________ ______ 500, 508 (1979). Appellate courts are unable to vindicate that interest where defendants wait until after trial to raise the immunity defense. See id. There thus may be a ___ ___ greater systemic interest in ensuring that the interest is raised early. Much of what the immunity protects cannot be remedied here. Because the defendants never asserted a defense of immunity, the action was fully tried before the question was ever put to the district court. Legislators have already testified. Deciding the merits of the constitutional question entails no additional burden or inconvenience upon the defendants. The need to ignore the defendants' waiver in order to reach the immunity issue is, as a result, greatly reduced.17  ____________________ 17. Even if one could overlook defendants' waiver, we could not reach the immunity issue absent a showing of plain error by the district court. Cf. United States v. Olano, 113 S. ___ _____________ _____ Ct. 1770, 1776-78 (1993); United States v. Saccoccia, 58 F.3d _____________ _________ 754, 790 (1st Cir. 1995). Plain error analysis does apply in the civil context. See, e.g., Consolo v. George, 58 F.3d ___ ____ _______ ______ 791, 793 (1st Cir. 1995) (jury instructions to which no objection lodged subject only to plain error review); Lewis _____ v. Kendrick, 944 F.2d 949, 953 (1st Cir. 1991) (district ________ court's failure to grant qualified immunity reviewable only for plain error where defense was not timely raised); Javelin _______ Investment, S.A. v. Municipality of Ponce, 645 F.2d 92, 94-95 ________________ _____________________ (1st Cir. 1981) (same, for a sufficiency-of-evidence claim). -42- -42- Even overlooking the defendants' waiver, however, I believe that their claim of absolute legislative immunity fails. The Supreme Court's case law demonstrates that even if a suit asserting individual rights could not be brought to challenge a legislative act per se, it is not barred by ___ __ legislative immunity if it merely seeks prospective relief against a legislative employee for his role in carrying out or enforcing the directives of that same legislative act. That is precisely what the plaintiffs seek here. There is no immunity for practices that simply relate to legislative activities. See Doe v. McMillan, 412 ___ ___ ________ U.S. 306, 313 (1973) ("Our cases make perfectly apparent . . . that everything a [legislator] may regularly do is not a legislative act within the protection of the Speech or Debate Clause."); United States v. Brewster, 408 U.S. 501, _____________ ________ 515 (1972) ("In no case has this Court ever treated the Clause as protecting all conduct relating to the legislative ________ process." (emphasis in original; footnote omitted)); Powell, ______ 395 U.S. at 503 ("Legislative immunity does not, of course, bar all judicial review of legislative acts."). Moreover, "[t]hat [legislators] generally perform certain acts in their  ____________________ Whatever difference of opinion the question of legislative immunity might allow, the district court's "failure" to afford such immunity to defendants sua sponte was not clearly ___ ______ in error, and certainly did not produce a gross miscarriage of justice or seriously affect the fairness, integrity or public reputation of the judicial proceedings. See Olano, ___ _____ 113 S. Ct. at 1779. There was no plain error. -43- -43- official capacity as [legislators] does not necessarily make all such acts legislative in nature." Gravel v. United ______ ______ States, 408 U.S. 606, 625 (1972). Rather, as the majority ______ agrees, the doctrine of legislative immunity protects "only purely legislative activities." Brewster, 408 U.S. at 512; ________ Chastain v. Sundquist, 833 F.2d 311, 314 (D.C. Cir. 1987) ________ _________ (quoting Brewster), cert. denied, 487 U.S. 1240 (1988). ________ ____________ The basic protection of the doctrine of legislative immunity attaches to actual "speech or debate" by legislators. Gravel, 408 U.S. at 625. The Supreme Court has ______ made clear that [i]nsofar as [legislative immunity] is construed to reach other matters, they ____ must be an integral part of the __________________________________________ deliberative and communicative processes __________________________________________ by which [legislators] participate in __ committee and House proceedings with ____________________________________ respect to the consideration and passage or rejection of proposed legislation or with respect to other matters [within the legislature's constitutional jurisdiction]. Hutchinson v. Proxmire, 443 U.S. 111, 126 (1979) (emphases in __________ ________ original) (quoting Gravel, 408 U.S. at 625). The majority ______ does not dispute this definition of the scope of legislative immunity. It is important to recognize that the plaintiffs here seek only to enjoin Rule 45's enforcement. In my view, ___________ legislative immunity does not reach enforcement of the House Rule because such enforcement is not "an integral part of the -44- -44- deliberative and communicative processes" of the state legislature. Of course, the regulation of the admission of the public to the House's floor has an important impact on the ______ legislative process -- that is what this lawsuit is about. But it belies common usage, I believe, to say that the defendants' practices relating to the admission or exclusion of classes of persons from the House floor constitute "an integral part of the deliberative and communicative processes" of the legislature. Certainly, such practices are not part and parcel of the legislative process in the same fashion as are the kinds of legislative acts to which the Supreme Court has previously extended legislative immunity: e.g., voting for a resolution, Kilbourn v. Thompson, 103 U.S. ____ ________ ________ 168, 204 (1881), making a speech on the floor, United States _____________ v. Johnson, 383 U.S. 169, 180 (1966), circulating documents _______ to other legislators, McMillan, 412 U.S. at 312, or the ________ gathering of information for a committee hearing, Dombrowski __________ v. Eastland, 387 U.S. 82, 84 (1967) (per curiam).18 See ________ ___  ____________________ 18. An action challenging any of these immunized activities would have required proof, as this case does not, of the substance of a legislator's act -- e.g., how the legislator ____ voted, or the content of a speech or the content of communications to other legislators. See Gravel, 408 U.S. at ___ ______ 618-21 (drawing this distinction); see also Brewster, 408 ___ ____ ________ U.S. at 526 (holding that act of bribery was not immune from prosecution if government did not need to prove "how [defendant] spoke, how he debated, how he voted, or anything he did in the chamber or in committee"). -45- -45- Brewster, 408 U.S. at 516 ("In every case thus far before ________ this Court, the Speech or Debate Clause has been limited to an act which was clearly a part of the legislative process." _________________________________________ (emphasis added)). It is not enough, as the majority suggests, that the practice challenged here "affects" the way the legislature conducts its affairs or "colors the very conditions under which legislators" do their work. In Hutchinson v. Proxmire, the Supreme Court, in refusing to __________ ________ extend legislative immunity to certain statements made by a senator in a press release, acknowledged that a senator's ability to make such statements was arguably "essential to the functioning of the Senate" and conceded that such statements affected the legislative environment. 443 U.S. at 130, 131 ("We may assume that a Member's published statements exert some influence on other votes in the Congress and therefore have a relationship to the legislative and deliberative process."). Yet, the Court concluded that no legislative immunity attached to such statements.19 In doing so, it observed that it had, in the past, "carefully distinguished between what is only 'related to the due _____________________  ____________________ 19. Similarly, in Bond v. Floyd, 385 U.S. 116 (1966), the ____ _____ Supreme Court allowed a suit to go forward challenging on First Amendment grounds the constitutionality of certain legislative resolutions preventing the seating of Julian Bond in the Georgia legislature that had been passed in response to political statements by Bond that had apparently displeased his fellow legislators. -46- -46- functioning of the legislative process,' and what constitutes ___________ ___________ the legislative process entitled to immunity under the _________________________ [Speech or Debate] Clause." Id. at 131 (emphases added; ___ citation omitted). Here, the defendants' challenged practices, while perhaps "related to the due functioning of the legislative process," simply do not "constitute[] the legislative process" in the sense necessary to trigger absolute legislative immunity. Cf. United States v. McDade, ___ _____________ ______ 28 F.3d 283, 299 (3d Cir. 1994) (declining to extend legislative immunity for acts which, "although [they comprised] a necessary precondition for the performance of [legislative] acts," could not be said to be "an integral part of Congress's deliberative and communicative processes"), cert. denied, 115 S. Ct. 1312 (1995). ____________ That the defendants' challenged practices are not "legislative" in the sense necessary to trigger immunity and that the plaintiffs' claim for injunctive relief is not barred -- most clearly as it names the House doorkeeper -- is established by a venerable line of Supreme Court authority. In Kilbourn v. Thompson, 103 U.S. 168 (1881), the Court found ________ ________ that members of the U.S. House of Representatives were entitled to legislative immunity in a lawsuit arising from an unconstitutional House resolution that had authorized the arrest of the plaintiff. However, the Court permitted the _________ suit to go forward against the House's Sergeant at Arms, who -47- -47- had merely executed the unconstitutional arrest warrant. See ________ ___ id. at 202. As the Supreme Court later summarized the ___ holding of Kilbourn: "That the House could with impunity ________ order an unconstitutional arrest afforded no protection for those who made the arrest." Gravel, 408 U.S. at 618. The ______ unconstitutional "resolution was subject to judicial review," the Court explained, "insofar as its execution impinged on a citizen's rights." Id. ___ Some ninety years after Kilbourn, in Powell v. ________ ______ McCormack, the Court reaffirmed the principle that a suit for _________ injunctive relief brought against a legislative employee in an enforcement-type capacity is not barred by legislative ___ immunity. 395 U.S. at 504-05. There, the Court held that the defendant congressmen were entitled to legislative immunity for their unconstitutional refusal to seat Adam Clayton Powell as a Member of the U.S. House of Representatives. See id. at 506. Applying the teaching of ___ ___ Kilbourn, the Court went on to hold that the doctrine of ________ legislative immunity did not bar a judicial determination of ___ the merits of plaintiffs' constitutional claims, to the extent that those claims were asserted against the legislative employees who had merely been responsible for enforcing the House's resolution, namely, the Sergeant at _________ Arms, the Clerk, and the Doorkeeper. See id. at 504-06. The ___ ___ Court added that those officials could not assert legislative -48- -48- immunity on the ground that they had simply been "acting pursuant to express orders of the House." Id. at 504.20 ___ The Court in Powell thus "reasserted judicial power to ______ determine the validity of legislative actions impinging on individual rights" in an action for prospective relief brought against the legislative functionaries charged with implementing the allegedly unconstitutional activity. Gravel, 408 U.S. at 620. ______ The Court had applied similar reasoning in Dombrowski v. Eastland, 387 U.S. 82 (1967) (per curiam), __________ ________ decided shortly before Powell. In that case, which arose out ______ of an allegedly illegal raid, the Court sustained the defense of legislative immunity with respect to the Chairman of a subcommittee of the U.S. Senate Judiciary Committee for issuing subpoenas to gather information, but declined to extend immunity to the subcommittee's counsel, who had allegedly participated in the execution of the illegal raid to obtain the same information. See id. at 84. Dombrowski ___ ___ __________ thus supports the principle that a legislative employee sued for his role in carrying out or executing an (immunized)  ____________________ 20. I respectfully disagree, therefore, with the majority's suggestion that the legislative immunity doctrine protects any legislative officials "who do no more than carry out the will of the body by enforcing [Rule 45] as a part of their official duties." To the extent that the decision in Consumers Union of United States, Inc. v. Periodical _____________________________________________ __________ Correspondents' Ass'n, 515 F.2d 1341 (D.C. Cir. 1975), can be _____________________ read for a contrary proposition, I would decline to follow it. -49- -49- legislative directive may be answerable to a private citizen whose rights have been violated. See Gravel, 408 U.S. at ___ ______ 619-20. More recently, in Supreme Court of Virginia v. ___________________________ Consumers Union of the United States, Inc., 446 U.S. 719 _____________________________________________ (1980), the Supreme Court was presented with an action brought under 42 U.S.C. 1983 asserting a First Amendment challenge against certain attorney disciplinary rules that had been enacted by the Virginia Supreme Court. The plaintiffs sought declaratory and injunctive relief, naming the Virginia Court and its Chief Justice (among others) as defendants. The Supreme Court concluded that the Virginia Court, in propounding the disciplinary rules, had acted in a legislative (not judicial) capacity. The Virginia Court was held entitled to absolute legislative immunity for acts pertaining to the enactment of the disciplinary rules, e.g., ____ refusing to amend the rules to comport with the Constitution. See id. at 733-34. The Supreme Court further observed, ___ ___ however, that the Virginia Court performed not only a legislative role with respect to the disciplinary rules, but also had enforcement authority. See id. at 734. The Court ___________ ___ ___ concluded that to the extent that the plaintiffs' section 1983 action sought prospective relief against the Virginia Court in its enforcement capacity, the doctrine of ___________ legislative immunity did not bar the suit. Id. at 736 ("[W]e ___ -50- -50- believe that the Virginia Court and its chief justice properly were held liable in their enforcement capacities. . . . For this reason the Virginia Court and its members were proper defendants in a suit for declaratory and injunctive relief, just as other enforcement officers and agencies were.").  ____________________ 21. Moreover, the defendants' actions in restricting access The Supreme Court's decisions in Kilbourn, ________ to the floor and lobbying can be viewed as administrative (rather than legislative) in nature, and thus not entitled to Dombrowski, Powell, and Supreme Court of Virginia establish __________ ______ _________________________ immunity on that additional ground. Because immunity is defined by the functions it serves, Forrester v. White, 484 _________ _____ that the doctrine of legislative immunity does not bar a U.S. 219, 227 (1988), even legislators themselves are not immune for actions taken in an administrative capacity. In judicial determination of a plaintiff's constitutional claim Forrester, a state court judge enjoyed no judicial immunity _________ for the administrative acts of demoting and dismissing a to the extent that the claim is one for injunctive relief and probation officer. Even though the acts "may have been quite important in providing the necessary conditions of a sound is asserted against a defendant simply for his role in adjudicative system," the decisions underlying the acts were generic in nature, not intrinsically adjudicative or peculiar enforcing a legislative directive that affects individual _________ to the judicial function. See id. at 229. A "judge who ___ ___ hires or fires a probation officer [could not] meaningfully rights. See Gravel, 408 U.S. at 618-21. The plaintiffs' ___ ______ be distinguished from a district attorney who hires and fires assistant district attorneys, or indeed from any other action here -- most clearly as it names the House doorkeeper Executive Branch official who is responsible for making such employment decisions." Id.; see also Negron-Gaztambide v. ___ ________ _________________ -- comprises precisely such a claim: the doorkeeper is being Hernandez-Torres, 35 F.3d 25, 28 (1st Cir. 1994) (legislators ________________ not protected by legislative immunity for administrative act sued solely for his role in enforcing the challenged of dismissing librarian), cert. denied, 115 S. Ct. 1098 _____________ (1995). exclusion of all but government lobbyists from lobbying on Under this functional analysis, the defendant doorkeeper's acts in determining whether particular the House floor, and the claim seeks only to enjoin such individuals were authorized to enter the House chamber are of an "administrative" nature within the meaning of Negron- _______ enforcement. The defendant doorkeeper is not distinguishable Gaztambide. See id. These acts constitute determinations __________ ___ ___ concerning admission and exclusion, no different in nature in any meaningful way from the doorkeeper whose claim of than those that might be made by an official in the executive branch entrusted with controlling access to a Governor's absolute legislative immunity was rejected in Powell. See ______ ___ press conference or, indeed, a doorkeeper standing outside a privately-owned building. The doorkeeper's acts do not Powell, 395 U.S. at 504. I would conclude, therefore, that ______ entail any peculiarly legislative decisionmaking -- in this case, those decisions were already embodied in the House's the defendant doorkeeper is not entitled to assert the adoption of Rule 45. The acts of the doorkeeper in administering Rule 45 to particular persons seeking access to defense of absolute legislative immunity,21 and I would the House chamber are thus not legislative, but administrative and not entitled to absolute immunity. -51- -51- accordingly proceed to a determination of the First Amendment question presented.22 Reaching the merits of plaintiffs' constitutional claim, importantly, does no injury to the classic interests protected by the legislative immunity doctrine. The common law immunity that state legislators enjoy is "similar in origin and rationale to that accorded Congressmen under the Speech or Debate Clause." Supreme Court of Virginia, 446 ___________________________ U.S. at 731. The actions of members of the House in speaking, debating, or voting on matters before the Rhode Island House are not being challenged. There is no infringement on the "fullest liberty of speech" of House members, nor does this case raise the need to protect House members "from the resentment of every one, however powerful, to whom the exercise of that liberty may occasion offense." Tenney v. Brandhove, 341 U.S. 367, 373 (1951) (citation ______ _________ omitted). The legislative immunity doctrine is not meant for the protection of the legislators for their own benefit, "but to support the rights of the people, by enabling their  ____________________ 22. As far as the record shows, the defendant Speaker did not participate in the exclusion of private lobbyists from the legislative floor. There is no need to decide, at this time, whether, if the Speaker did participate in other aspects of Rule 45's enforcement, he would be entitled to legislative immunity in an action brought against him solely for his role in such enforcement. Relief against the doorkeeper's enforcement of the Rule may provide plaintiffs with all the relief necessary. -52- -52- representatives to execute the functions of their office without fear of prosecutions, civil or criminal." Id. at __ 373-74 (citation omitted); see also Brewster, 408 U.S. at 507 ________ ________ ("The immunities of the Speech or Debate Clause were not written into the Constitution simply for the personal or private benefit of Members of Congress, but to protect the integrity of the legislative process by insuring the independence of individual legislators."). Reaching the merits of the constitutional question presented here poses no threat to the independence of the Rhode Island state legislators.23 Historically, the privileges of the Speech or Debate Clause emerged from a need to protect the legislature from executive intimidation and harassment. See Robert J. ___ Reinstein & Harvey A. Silverglate, Legislative Privilege and _________________________ the Separation of Powers, 86 Harv. L. Rev. 1113, 1120-44 __________________________ (1973). Indeed, the purpose underlying the Speech or Debate Clause, that is, to enable speech critical of the government, also underlies the First Amendment's protection of free speech. Cf. Akhil R. Amar, The Bill of Rights as a ___ ___________________________ Constitution, 100 Yale L.J. 1131, 1151 (1991). It would be ____________ ironic indeed to permit the defendants to invoke those  ____________________ 23. Davids v. Akers, 549 F.2d 120 (9th Cir. 1977), does not ______ _____ support the proposition that the defendants' practices are immune from constitutional scrutiny. The court there in fact reached the merits and scrutinized the plaintiffs' First Amendment claims, but found them wanting. -53- -53- immunities to benefit communications between the executive branch (government lobbyists) and the legislative branch, to the exclusion of communication from groups of private citizens. Judicial illumination of the immunity, as James Madison said, must be guided by "the reason and the necessity of the privilege." Letter from James Madison to Philip Doddridge (June 6, 1832), in 4 Letters and Other Writings of __ _____________________________ James Madison 221 (1884). That reason and necessity dictate _____________ that this court not credit the immunity defense on the facts of this case. First Amendment _______________ Is the First Amendment violated by the defendants' practice of admitting government lobbyists onto the House floor to lobby while excluding those not employed by the government? The answer, I believe, is that the defendants have violated the First Amendment.  Several interrelated and fundamental First Amendment interests are offended by the defendants' practices. The defendants have excluded the plaintiffs' political speech and have done so in a discriminatory manner. The defendants' practices have resulted in viewpoint- and content-based discrimination, favoring government speakers and government viewpoints and excluding non-government speakers and non-government viewpoints. The restrictions on speech posed by the practices are severe in their effects. -54- -54- Defendants' discriminatory practices also permit the government unchecked power to act in its self interest, rather than in the interest of the citizens. These effects strike at the heart of the First Amendment, and subject defendants' practices to the highest level of scrutiny, a scrutiny defendants cannot withstand.24 Those practices are not narrowly tailored to meet a compelling state interest, and therefore fail to pass constitutional muster. The parties have framed the First Amendment issue in terms of whether the House Chamber floor is a "public forum." But the "public forum" doctrine, itself problematic,25 is particularly ill-suited to this case. It  ____________________ 24. There are additional reasons to apply heightened scrutiny. In footnote 4 of United States v. Carolene ______________ ________ Products Co., 304 U.S. 144, 152 (1938), oft-quoted for other ____________ language, the Court noted the possibility that: legislation which restricts those political processes which can ordinarily be expected to bring about repeal of undesirable legislation [might] be subjected to more exacting judicial scrutiny under the general prohibitions of the Fourteenth Amendment than are most other types of legislation. The defendants' practices are analogous to just such restrictive legislation. See John H. Ely, Democracy and ___ ______________ Distrust 76-77 (1980). ________ 25. At best, the public forum doctrine is an "analytical shorthand for the principles that have guided the Court's decisions." Cornelius v. NAACP Legal Defense and Educational _________ ___________________________________ Fund, Inc., 473 U.S. 788, 820 (Blackmun, J., dissenting). ___________ "Beyond confusing the issues, an excessive focus on the public character of some forums, coupled with inadequate attention to the precise details of the restrictions on -55- -55- is peculiar to attempt to fit the doctrine to the floor of the chamber of a legislative body at work. Indeed, the very language of "public forum" masks the issues at stake. As recognized by the district court, the approach taken by this Court in AIDS Action Committee of _____________________________ Massachusetts, Inc. v. Massachusetts Bay Transportation ____________________ ___________________________________ Authority, 42 F.3d 1 (1994), is more apt. This court held _________ that where the government was the proprietor of the property it was inappropriate to analyze under the "relatively murky" public forum doctrine a discriminatory government practice affecting First Amendment rights. Id. at 9. At issue in ___ AIDS Action Committee was the MBTA's practice of refusing, on _____________________ the grounds that its policy was not to run any sexually suggestive advertisements, to display condom advertisements in its subway and trolley cars, while it was at the same time running sexually suggestive movie advertisements. This court analyzed and rejected the government's claim that its practices were viewpoint neutral, finding the government practice gave rise to an impermissible appearance of viewpoint discrimination. Because this viewpoint discrimination disposed of the case, there was no need for  ____________________ expression, can leave speech inadequately protected in some cases, while unduly hampering state and local authorities in others." Laurence H. Tribe, American Constitutional Law 992- ___________________________ 93 (2d ed. 1988) (footnotes omitted); see also Daniel A. ___ ____ Farber & John E. Nowak, The Misleading Nature of Public Forum _____________________________________ Analysis: Content and Context in First Amendment _____________________________________________________________ Adjudication, 70 Va. L. Rev. 1219 (1984). ____________ -56- -56- the court to determine whether the cars were a public forum. For similar reasons, I do not use conventional "public forum" terminology. The discrimination in speech practiced by the defendant must be understood against those interests that the First Amendment has repeatedly been recognized as serving. The First Amendment reflects a distrust of the government making judgments about what speech is worthwhile, particularly where political speech is involved.26 A central commitment of the First Amendment is that "debate on public issues should be uninhibited, robust, and wide-open." New York Times Co. v. Sullivan, 376 U.S. 254, 270 (1964). ___________________ ________ "The maintenance of the opportunity for free political discussion to the end that government may be responsive to __ ___ ___ ____ __________ ___ __ __________ __ the will of the people and that changes may be obtained by ___ ____ __ ___ ______ lawful means, an opportunity essential to the security of the Republic, is a fundamental principle of our constitutional system." Stromberg v. California, 283 U.S. 359, 369 (1931) _________ __________  ____________________ 26. "An insistence that government's burden is greatest for regulating political speech is based on a sensible view of government's incentives. It is in this setting that government is most likely to be biased or to be acting on the basis of illegitimate, venal, or partial considerations. Government is rightly distrusted when it is regulating speech that might harm its own interests; and when the speech at issue is political, its own interests are almost always at stake. It follows that the premise of distrust of government is strongest when politics is at issue. And when the premise of distrust is strongest, the burden of justification is highest." Cass R. Sunstein, Democracy and the Problem of ______________________________ Free Speech 134 (1993). ___________ -57- -57- (emphasis added). "'[T]here is practically universal agreement that a major purpose of [the First] Amendment [is] to protect the free discussion of governmental affairs' . . . . 'For speech concerning public affairs is more than self- expression; it is the essence of self-government.'" Burson ______ v. Freeman, 504 U.S. 191, 196 (1992) (quoting Mills v. _______ _____ Alabama, 384 U.S. 214, 218 (1966) and Garrison v. Louisiana, _______ ________ _________ 379 U.S. 64, 74-75 (1964)). Political expression is at the center of the rights protected by the First Amendment. See ___ id.; Robert H. Bork, Neutral Principles and Some First ___ ____________________________________ Amendment Problems, 47 Ind. L.J. 1, 29 (1971); Cass R. ___________________ Sunstein, Free Speech Now, 59 U. Chi. L. Rev. 255, 301 ________________ (1992).  The defendants' practices in excluding the voice of private, but not government, lobbyists from the House floor imposes a severe burden on political speech. Lobbying aims at influencing the votes of legislators; it attempts to affect the outcome of the political processes. Such speech is "at the heart of the First Amendment's protection." First _____ National Bank of Boston v. Bellotti, 435 U.S. 765, 776 _________________________ ________ (1978). More specifically, lobbying involves the attempt by groups of citizens to have their hired representatives persuade legislators to legislate in ways that are favorable -58- -58- to the interests of those citizens.27 "In a representative democracy such as this, these branches of government act on behalf of the people and, to a very large extent, the whole concept of representation depends upon the ability of the people to make their wishes known to their representatives." Eastern Railroad Presidents Conf. v. Noerr Motor Freight, ___________________________________ _____________________ Inc., 365 U.S. 127, 137 (1961); see also Meyer v. Grant, 486 ____ ___ ____ _____ _____ U.S. 414, 421 (1988) ("[B]oth the expression of a desire for political change and a discussion of the merits of the proposed change" are "core political speech."). Where a challenged practice, as here, imposes a severe burden on political expression, courts must review the practice with  ____________________ 27. Lobbying may be protected not only as speech, but also as an exercise of the right to petition. That right, explicitly embodied in the First Amendment, encompasses the right of citizens to communicate with their legislative representatives. See Eastern Railroad Presidents Conf. v. ___ __________________________________ Noerr Motor Freight, Inc., 365 U.S. 127, 137 (1961) (stating __________________________ that the right of petition protects "the ability of the people to make their wishes known to their representatives"). As lobbying constitutes an important means by which citizens can collectively make their wishes known to the legislature, lobbying itself may fall under the coverage of the Petition Clause. See id. at 137-38; United States v. Nofziger, 878 ___ ___ _____________ ________ F.2d 442, 453 (D.C. Cir.) (reading Supreme Court precedents for the proposition that lobbying, "insofar as it constitutes self-representation," is protected by the First Amendment right to petition), cert. denied, 493 U.S. 1003 (1989); see ____________ ___ generally Amar, Bill of Rights, supra, at 1155-56 (suggesting _________ ______________ _____ that part of the purpose of the Petition Clause was to guarantee that citizens would have a means of informing representatives of their needs and concerns). -59- -59- strict scrutiny. Cf. Burdick v. Takushi, 504 U.S. 428, 434 ___ _______ _______ (1992).28 The private lobbyist restriction is subject to strict scrutiny not only because it severely burdens political speech, but also because it discriminates both on the basis of viewpoint and content. See Burson, 504 U.S. at ___ ______ 197. The restriction constitutes content-based discrimination because it targets a particular kind of speech. It is also viewpoint-based discrimination because it excludes a particular set of messages. The result is a speaker-based ban and a content-based bar that gives advantage to the government's viewpoint.29 The discrimination practiced by defendants thus permits expression of the "particular message favored by the government" and stifles all other speech. See Turner ___ ______ Broadcasting System, Inc. v. FCC, 114 S. Ct. 2445, 2458 ___________________________ ___ (1994); id. at 2477 (O'Connor, J., concurring in part and ___  ____________________ 28. Lobbying is not subject to a lower standard of protection even if the hired representatives do it for a profit. See Board of Trustees of the State Univ. of N.Y. v. ___ _____________________________________________ Fox, 492 U.S. 469, 482 (1989). ___ 29. That the non-governmental viewpoint may in fact be an entire class of varying viewpoints does not make the restriction any the less viewpoint discrimination. See ___ Rosenberger v. Rector and Visitors of the Univ. of Va., 115 ___________ _________________________________________ S. Ct. 2510, 2518 (1995) (rejecting argument that "no viewpoint discrimination occurs because the [challenged rules] discriminate against an entire class of viewpoints", and saying that the "declaration that debate is not skewed so long as multiple voices are silenced is simply wrong"). -60- -60- dissenting in part) ("The First Amendment does more than just bar government from intentionally suppressing speech of which it disapproves. It also generally prohibits the government from excepting certain kinds of speech from regulation because it thinks the speech is especially valuable."). The defendants' practices thus cannot be constitutional unless they are narrowly tailored to achieve a compelling state interest. Id. at 2467 ("[S]peaker-based laws ___ demand strict scrutiny when they reflect the Government's preference for the substance of what the favored speakers have to say (or aversion to what the disfavored speakers have to say)."); First Nat'l Bank of Boston, 435 U.S. at 785 ____________________________ (First Amendment forbids government from "dictating the subjects about which persons may speak and the speakers who may address a public issue."). The government lobbyist preference as applied here fails that test. The dangers of the defendants' practices are plain.30 By simply excluding all voices save the voices of government lobbyists, the government could easily  ____________________ 30. In the franchise cases, corollary concerns about the representative nature of government led the Supreme Court to invalidate laws which resulted in groups of persons being frozen out of the decision process. Reynolds v. Sims, 377 ________ ____ U.S. 533 (1964); Harper v. Virginia Bd. of Elections, 383 ______ __________________________ U.S. 663 (1966); Carrington v. Rash, 380 U.S. 89 (1965) __________ ____ (invalidating Texas statute denying franchise to those in military who moved into the state where Texas attempted to justify the statute by arguing military personnel might otherwise start influencing elections). -61- -61- suppress support for a minority party or an unpopular cause, or . . . exclude the expression of certain points of view from the marketplace of ideas. Members of the City Council v. Taxpayers for Vincent, 466 _____________________________ ______________________ U.S. 789, 804 (1984). These effects are "so plainly illegitimate that they would immediately invalidate the rule." Id. "[Rhode Island] has no . . . authority to ___ license one side of [the] debate to fight freestyle, while requiring the other to follow Marquis of Queensbury Rules." R.A.V. v. City of St. Paul, Minn., 112 S. Ct. 2538, 2548 ______ _________________________ (1992).  Nor is this risk hypothetical. The Rhode Island House is singular in the lack of opportunity for private citizens to have direct, effective communications with legislators. The ability to communicate directly is a considerable advantage. The situation created by the private lobbyist ban is that akin to a monopoly over a single channel of communication, where the government has discriminated in providing access to that channel and also determined the content of what flows through the channel.  Against this panoply of dangers31 must be  ____________________ 31. Defendants' argument poses yet other dangers too. If the legislature gets information from nowhere but the executive branch, the legislature's ability to act independently, and thus to be a check and balance to the executive is undercut. This corollary danger of the undercutting of the separation of powers at the state level is keenly illustrated by the amicus brief filed by the executive branch, urging strongly its interest in -62- -62- measured the interests attributed to the defendants. The majority finds, in the immunity analysis, that there are two such interests32 and that the interests would pass a rational basis test, at least for determining whether to carve out an exception to the immunity it would grant. Without accepting the premise that the only exceptions to immunity are irrational legislative acts, neither of those interests is sufficient to withstand strict scrutiny.33 Indeed, the  ____________________ communicating with the legislature and supporting the exclusion of private voices. 32. To the extent that the House Rule on its face was justified as an effort to maintain decorum and control noise to a level which did not interfere with the members work, the record shows instances in which government lobbyists on the __________ floor were objected to by members as causing problems. The defendants accordingly do not try to justify their discriminatory distinction on such grounds. 33. Defendants' practice does not even meet the less rigorous test of intermediate scrutiny. Intermediate scrutiny of restrictions has traditionally been applied to commercial speech that concerns unlawful activity or is misleading, see Florida Bar v. Went For It, Inc., 115 S. Ct. ___ ___________ _________________ 2371, 2375 (1995), and to content-neutral restrictions that impose an incidental burden on speech, see Turner ___ ______ Broadcasting, 114 S. Ct. at 2469. The test has three related ____________ prongs: first, the government must assert a substantial interest in support of the regulation; second, the government must demonstrate that the restriction directly and materially advances that interest; and third, the regulation must be "narrowly drawn." Florida Bar, 115 S. Ct. at 2376. The ___________ government's asserted interest in having government lobbyists on the floor of the House, to the exclusion of private lobbyists, is to have them provide information. But the government has not shown why the interest in having only government provide information, and not private groups, is "substantial." Relatedly, the restriction is not "narrowly tailored" to meet the information provision goal because it is overbroad and serves to exclude valuable information that private lobbyists might provide.  -63- -63- defendants' bedrock argument is different again, and it, too, is insufficient. The majority credits reasons of bolstering legislative independence and of having government lobbyists act to provide information. But legislative independence was proffered as a reason for Rule 45 on its face, which excludes all lobbyists, and not to the distinction between government and non-government lobbyists.34 Defendants argue that allowing only governmental lobbyists access to the floor of the legislature serves the goal of allowing legislators to receive valuable information. Defendants, however, have established no demonstrable interest in receiving information from the government to the exclusion of private sources. The state's purported interest in limiting the information available to legislators to those  ____________________ 34. A goal of legislative independence is quite legitimate. But the interest distinctively served by the private lobbyist restriction is to display to the public the legislature's special hostility towards the private interest groups that attempt to influence their votes. "The politicians of [Rhode Island] are entitled to express that hostility -- but not through the means of imposing unique limitations upon speakers who (however benightedly) disagree." R.A.V., 112 S. ______ Ct. at 2550. "The point of the First Amendment is that majority preferences must be expressed in some fashion other than silencing speech on the basis of its content." Id. at ___ 2548. "[T]he First Amendment as we understand it today rests on the premise that it is government power, rather than private power, that is the main threat to free expression; and as a consequence, the Amendment imposes substantial limitations on the Government even when it is trying to serve concededly praiseworthy goals." Turner Broadcasting, 114 S. ___________________ Ct. at 2480 (O'Connor, J., concurring in part and dissenting in part). -64- -64- sources controlled by its own interests is hardly a compelling one.35 "A State's claim that it is enhancing the ability of its citizenry to make wise decisions by restricting the flow of information to them must be viewed with some skepticism. . . . '[I]t is often true that the best means to that end is to open the channels of communication rather than to close them.'" Anderson v. Celebrezze, 460 U.S. ________ __________ 780, 798 (1983) (quoting Virginia Pharmacy Board v. Virginia _______________________ ________ Consumer Council, 425 U.S. 748, 770 (1976)). ________________ Further, the private lobbyist restriction is not narrowly tailored to serve the legislature's asserted interest in receiving information. Simon & Schuster, Inc. v. ______________________ Members of the New York State Crime Victims Bd., 112 S. Ct. ________________________________________________  ____________________ 35. Defendants attempt to liken their private lobbying restriction to the restrictions on lobbying imposed by Rule XXXII of the United States House of Representatives. Defendants' analogy, however, works against them and demonstrates that there is no "compelling" need to give government lobbyists access to the floor to lobby while excluding others. Unlike the defendants' practices, the U.S. House of Representatives Rule does not allow government lobbyists to lobby while excluding private lobbyists. Rule XXXII is neutral and excludes all lobbyists. Even those normally afforded the courtesy of admission to the floor -- former Members of the House, former Parliamentarians, former elected officers, and former elected minority employees of the House -- are denied admission if they or their organizations have any interest in matters before the House. Similarly, staff of a Member are not allowed to lobby on the occasions they are admitted to the House. That the United States House of Representatives has chosen neutrality and not to grant preference to the government lobbyists and information providers (if there is any distinction) undercuts any argument by defendants that they have a compelling need to give preference to the government. -65- -65- 501, 511 n.** (1991). In this case the restriction excludes valuable information from the legislative purview. As the majority points out, lobbying groups have vastly different interests and perspectives. Access to such varied and independent sources of information, far from impeding the legislature's access to useful information, surely functions to increase both the quality and the quantity of the total set of information available.  The provision of information from executive branch agencies to members of the legislature is a very legitimate interest of government. The majority suggests there is a distinction between mere information providing and lobbying, but that distinction is contradicted by the record. The factual findings of the district court leave no doubt that the court considered the contention that government lobbyists were engaging in mere "information-providing" and rejected it as a factual matter.  Even if the distinction were tenable on the facts here, as it is not, it does not provide refuge from the First Amendment. There is plainly value to the speech by government lobbyists, whether it be heavy-handed lobbying or more lightly dexterous provision of information. See Block ___ _____ v. Meese, 793 F.2d 1303, 1312-14 (D.C. Cir.) (Scalia, J.), _____ cert. denied, 478 U.S. 1021 (1986). But the value of _____________ government speech is not the point. Rather, the point is -66- -66- that the government has permitted itself to speak while prohibiting non-government speech.  Speech from non-government speakers, including lobbyists, is also valuable. Indeed, while lobbying may be subject to registration and disclosure,36 no case has ever suggested that lobbying, including its information-gathering and providing component, could be banned entirely. But that issue need not be reached here, for what is clear is that the government must keep the playing field level.37 Moreover, even if there were greater reason to credit the distinction between "information providing" and "lobbying," First Amendment "due process" type issues would still preclude reliance on the distinction to justify the restriction of First Amendment rights. See Henry P. ___ Monaghan, First Amendment "Due Process", 83 Harv. L. Rev. ______________________________  ____________________ 36. This case does not involve any issue of government subsidy, creation of a government program, or of the taxable status of organizations involved in lobbying. Cf. Regan v. ___ _____ Taxation With Representation, 461 U.S. 540 (1983). ____________________________ 37. It is recognized in the political science literature that much of what modern day lobbyists do involves the gathering and provision of information to legislators. Cf. ___ Edward O. Laumann et al., Washington Lawyers and Others: The __________________________________ Structure of Washington Representation, 37 Stan. L. Rev. 465, ______________________________________ 495 (1985); James Q. Wilson, Political Organizations xix-xx _______________________ (1995); Jeffrey S. Banks & Barry R. Weingast, The Political ______________ Control of Bureaucracies under Asymmetric Information, 36 Am. _____________________________________________________ J. Pol. Sci. 509 (1992). Political scientists have found that lobbyists' primary strategy in influencing legislators is to provide information to counteract the similar efforts of other groups, not to achieve influence through pressure tactics. See David Austen-Smith & John R. Wright, ___ Counteractive Lobbying, 38 Am. J. Pol. Sci. 25 (1994). ______________________ -67- -67- 518, 519 (1970) ("If the Constitution requires elaborate procedural safeguards in the obscenity area, a fortiori it should require equivalent procedural protection when the speech involved - for example, political speech - implicates more central first amendment concerns."). Even if there were a discernible distinction, the "difference between factual statement and advocacy may turn upon the debatability of the facts described as true, or the pertinency of facts omitted." Block, 793 F.2d at 1313. The distinction between providing _____ information and acting for the purpose of "influencing in any manner the passage of legislation" is exceedingly fine. Here, legislators testified that "information" provided did in fact influence them on how to vote. The House has recognized that information may influence votes. Rule 45 on its face provides that "no person . . . shall either directly ________ or indirectly" engage in the practice of lobbying. The House _____________ has thus drawn the line to preclude any activity, even indirect, to influence votes. The First Amendment puts the burden on the government to finely tailor its practices to permissible goals, and no such fine tailoring was done by defendants' practices here. See Rubin v. Coors Brewing Co., ___ _____ _________________ 115 S. Ct. 1585, 1593 (1995). The real argument that the defendants have articulated to justify their actions is their claim that government lobbyists represent the people while non- -68- -68- government lobbyists do not. Accordingly, they say, there is no cause to worry. That is an inversion of constitutional values. While there may be value to the government voice, it cannot be the only voice. To permit that to be so would be to stifle discussion. See Buckley v. Valeo, 424 U.S. 1, 14 ___ _______ _____ (1976) ("Discussion of public issues . . .[is] integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression in order 'to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" (citing Roth v. United States, 354 U.S. 476 (1957))). ____ _____________ There is another danger, and that is that the government's voice will not truly represent the interests of the public.38 Government should theoretically represent  ____________________ 38. Defendants express a legitimate concern that government may be captured by "special interests." Apart from the fact that the government itself is frequently its own special interest group, the solution to the problem of a government captured by "special interests" would hardly be to have the government speak only to itself. Moreover, many of the plaintiff groups may hardly be characterized as the centers of wealth, power and privilege. Citizens, who themselves may not be affluent or powerful, band together in groups to lobby the government, whether the groups be, to give but two examples, the Rhode Island State Right To Life Committee, Inc., or the local chapter of the ACLU. These groups may be thought to be a way to avoid the capturing of government by "special interests." Defendants' practices may thus thrust them headlong into the dangers they profess to wish to avoid. Central to effecting a system of democratic self-governance is enabling private interests to be able to act in concert. Without collective action it may be impossible to alter the status quo. See ___ -69- -69- the people and not represent itself. Theory and reality often depart. The government is not always a mirror of the people. Government employees today are recognized as constituting their own interest group. See E. Nordlinger, On ___ __ the Autonomy of the Democratic State (1981). ____________________________________ The Framers had a fear that, once in power, legislators had an obvious incentive to use "that power to perpetuate themselves or their ilk in office." U.S. Term _________ Limits, Inc. v. Thornton, 115 S. Ct. 1842, 1911-12 (1995) _____________ ________ (Thomas, J., dissenting) (pointing out numerous instances of modern day legislation and rulemaking that produce the effect of perpetuating incumbents in office). T h e F r a m e r s recognized this would happen and intended the First Amendment to act as a check. James Madison identified the problem of government acting in its self-interest, in contrast to the interests of those it purported to represent, as one of the two fundamental problems of the republican form of government.39 "It is of great importance in a republic not  ____________________ Sunstein, Democracy and the Problem of Free Speech, supra, at ________________________________________ _____ 245-46. 39. In a seminal immunity case, Justice Black recognized Unfortunately, it is true that legislative assemblies, born to defend the liberty of the people, have at times violated their sacred trusts and become the instruments of oppression. . . . Those who cherish freedom [under the First Amendment] here would do well to remember that this freedom cannot long -70- -70- only to guard the society against the oppression of the _______________________________________________________ rulers, but to guard one part of society against the ______ injustice of the other part." The Federalist No. 51, at 161 _____________________ (James Madison) (Roy P. Fairfield 2d ed. 1981) (emphasis added). Madison feared that government might choose to serve itself instead of the citizens, saying: In framing a government which is to be administered by men over men, the great difficulty lies in this: you must first enable the government to control the governed; and in the next place oblige it to control itself. A dependence on the people is, no doubt, the primary control on government; but experience has taught mankind the necessity of auxiliary precautions. Id. at 160; see also Amar, The Bill of Rights, supra, at ___ ___ ____ ____________________ _____ 1132-33. Central among those "auxiliary precautions" in obliging the government to control itself from self-interest and self-dealing are the protections afforded to citizens by  ____________________ survive the legislative snuffing out of freedom . . . to speak. Tenney v. Brandhove, 341 U.S. 367, 380-81 (1951) (Black, J., ______ _________ concurring). Justice Black echoed concerns voiced earlier by one of the Framers of the Constitution and advocates for adoption of the Bill of Rights: "No legislative act, therefore, Contrary to the Constitution, can be valid. To deny this would be to affirm . . . that the representatives of the people are superior to the people themselves." The ___ Federalist No. 78, at 228 (Alexander Hamilton) (Roy P. ___________________ Fairfield 2d ed. 1981) (reply to "Brutus").  -71- -71- the First Amendment. Defendants' actions violate this essential purpose of the First Amendment. Accordingly, I would affirm the declaration by the district court that the practices of the defendants are unconstitutional.40 In my view, the defendants must either adhere to the House Rule and exclude all from its floor who speak to influence its vote or the House must equally open its floor, and not prefer the government's voice. That choice belongs to the House. Under the Constitution, the choice of preferring the government voice and excluding the non-government voices does not.  ____________________ 40. The injunction entered by the District Court against the House, which was not a party to the suit, was in error. -72- -72-